**William E. LYNN, Plaintiff–Appellant,**

v.

**CSX TRANSPORTATION, INC., et al., Defendants–Appellees.**

No. 95–2240.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 11, 1996.

Decided May 24, 1996.

Charles D. Boutwell (argued), McCullough, Campbell & Lane, Chicago, IL, for Plaintiff–Appellant.

Paul V. Esposito, Douglas A. Lindsay, Lewis, Overbeck & Furman, Chicago, IL, Robert M. Rolfe (argued), J. G. Ritter, II, John E. Holleran, Hunton & Williams, Richmond, VA, for Defendants–Appellees.

Lawrence Brewster, Department of Labor, Plan Benefits Security Division, Washington, DC, for Robert B. Reich, amicus curiae.

Before ESCHBACH, COFFEY, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

This case arises under the Employee Retirement Income Security Act. What William Lynn, the appellant, has at stake is the amount of his monthly pension check. At stake for the increasing number of companies offering early retirement programs to their employees is the immunity from suit they think they are contracting for as part of the deal. More specifically, this case presents the question of whether a release from liability signed by an employee in exchange for participation in an early retirement program is void in light of the anti-alienation provision of ERISA. With the question in mind, we turn to the facts.

Lynn worked for CSX Transportation and its predecessors for most of his adult life. He began working for the C & O Railroad[1] in February of 1953 as a contract worker—a unionized employee working under a collective bargaining agreement. In May of that year he took a military leave of absence and entered the armed forces. In May of 1955, after being honorably discharged from the service, he went back to work at the company. From his return to the company until 1972, Lynn again worked on a contract basis, and was compensated with a daily or hourly rate of pay. In 1972, he was promoted to the position of assistant trainmaster, a nonunion job for which he earned monthly compensation.[2] He continued as assistant trainmaster until 1987, when he retired under the company's early retirement program.

In order to participate in the early retirement program, Lynn signed a "voluntary resignation agreement." Under the agreement, Lynn's pension is governed by the terms of the company's 1987 pension plan. The 1987 plan provides a schedule according to which the amount of the pension payments due a plan participant is calculated. The schedule takes into account the retiree's age and years of "credited service" to the company. "Credited service," as defined by the plan, does not necessarily mean the total time a retiree was employed by the company. Rather, the term is used to describe the amount of time during which a person was both an employee of the company and a participant in the plan. The agreement provided that Lynn would receive an additional five years of service credit and an additional five years of age credit for purposes of the pension calculation. The agreement also included a release, which Lynn signed, agreeing to release the company from:

> any and all claims, demands, and legal proceedings of whatsoever kind or nature arising under any pertinent federal, state, local laws, ordinances or administrative decisions which I or my heirs or my personal representatives may now have or may now or hereafter assert against the Company growing out of or resulting from my employment and/or resignation of employment with the Company, whether now known or unknown, including, but not limited to: all claims of any nature regarding age, race, sex, national origin, religion, handicap discrimination, or labor protective provisions or conditions; wrongful discharge; or a breach of contract whether express or implied.

---

1. The Chesapeake & Ohio Railroad (C & O) was a predecessor of appellee CSX. In the mid-seventies, C & O became a subsidiary of the Chessie System Railroads. In 1980, Chessie merged with the Seaboard Coast Line Railroad Company to form the CSX Corporation. We refer to these different entities collectively as "the company."

2. In ordinary language, "monthly compensation" means a salary, and "nonmonthly compensation" means payment on the basis of time worked or tasks completed (for example, hourly wages or piecework). We use these terms instead of the corresponding, and more familiar, "salary" and "wages" for the sake of consistency with the language of the pension plans under which this dispute arose.

After the agreement was signed, the company's pension plan calculated the actual amount of Lynn's pension benefits. The plan based this calculation on Lynn's employment with the company plus the "five and five" early retirement provision. The plan found that Lynn's participation in the plan began when he became employed in a non-contract position paying monthly compensation. This occurred in 1972, when he was promoted to assistant trainmaster.

Lynn first contested the calculation of his pension in 1994, seven years after he retired. He claimed he should have received credit for the almost 20–year period during which he was a contract worker. He asked that the plan review his benefit calculation. The plan took a look at the situation but stood by its initial determination. Lynn filed an administrative appeal, which was denied, and he then filed a complaint under ERISA [3] in the United States District Court for the Northern District of Illinois. In his complaint, Lynn argued that the calculation of his pension benefits should have included the years 1953 to 1972, and, for the first time, he also said he should have been given pension credit for his two years of military service. The company filed a motion for summary judgment.

Looking to the plain language of the plan documents, the district court upheld the plan's determination that Lynn's credited service began in 1972. The court declined, however, to reach the merits of Lynn's claim for military service benefits, finding that this was a "contestable claim" barred by the release provision of the resignation agreement. Summary judgment was entered in favor of CSX on both counts, and Lynn appealed.

◼ We review a district court's grant of summary judgment *de novo*. *Smith v. Shawnee Library System*, 60 F.3d 317, 320 (7th Cir.1995). In performing this review, we must look not only to the language of the 1987 plan, but to those prior plans in effect during Lynn's lengthy period of employment with the company. This is necessary because, with certain inapplicable exceptions, a new plan may not take away benefits which

an employee holds under an existing plan. 29 U.S.C. § 1053. There are, therefore, three successive pension plans, and several amendments, involved here. The plans are generally referred to according to their effective dates as the 1952 plan, the 1983 plan, and the 1987 plan.

The 1952 plan was open to all employees who were paid monthly compensation. In 1964, the plan was amended to exclude contract workers, though there was a grandfather clause for those contract workers who were already participating. The plan was again amended in 1968 to limit eligibility to those who were already participants. The 1983 and 1987 plans were open only to non-contract employees receiving monthly or annual compensation. All of the plans also contained military service clauses. These clauses differed only slightly between plans, and stated that a plan participant who left the company to enter the armed forces would receive pension credit for the period of military service if the participant returned to the company within 90 days of discharge from the military. These clauses ensured that employees who were plan participants were not penalized for serving in the armed forces.

◼ Lynn argues that the district court erred in finding him ineligible for plan participation prior to his promotion in 1972. Whether he was eligible to participate in the plan before 1972 is purely a question of contract interpretation particularly suited for adjudication on a motion for summary judgment.

We start, obviously, with the plain language of the contract. In this case, that means looking to the plan documents. The 1952 plan defines those eligible to participate as those employees receiving "Compensation." "Compensation" is defined as "remuneration paid on a regular monthly or annual basis, excluding ... wages or other remuneration paid on an hourly, daily, piecework, or mileage basis." The 1983 and 1987 plans limit participation to nonunion,

---

**3.** Title 29 U.S.C. § 1132 provides that "[a]n employee benefit plan may sue or be sued under this title as an entity," § 1132(d)(1), by a participant or beneficiary to recover benefits due, to enforce or clarify his rights, § 1132(a)(1)(B), or to obtain "other appropriate equitable relief," § 1132(a)(3)(B), without regard to the amount in controversy or the citizenship of the parties, § 1132(f).

salaried employees, and expressly state that "a Participant who immediately prior to his Participation Commencement Date was an employee of the Company, but did not receive Compensation while so employed" will not receive pension credit for the prior period of employment. "Compensation" is defined in these plans as payment "on a regular salary basis" for work "that is not under the scope of a Labor agreement." No real "interpretation" is required to see that, according to the plain language of the plan documents, Lynn was not eligible to participate in the plan until he was promoted to assistant trainmaster in 1972. It's not even a close call. The plain language of the plans makes it crystal clear that credited service is only accrued while an employee is a plan participant.

Despite the plain language of the plan documents, Lynn contends that the district court erred in entering summary judgment against him on this issue. He bases this claim on a letter sent to employees of Chessie and Seaboard by John Collinson, president of Chessie System Railroads, in February of 1983. The letter referred to what became known as the 1983 plan, and informed employees that:

> [a]fter considerable study, Chessie and Seaboard have decided to adopt the same employee benefit program. While both railroads have made some adjustments, please be assured that you continue to have excellent employee benefits.
>
> You are urged to review the attached highlights in detail, since they include some of the more significant changes. Specifics of the new plans are in the summary descriptions, also attached. They should be inserted in your blue benefits notebook for ready reference.

Lynn argues that this letter supports his claim for additional benefits. The argument runs like this: prior to this letter, Seaboard contract workers earning nonmonthly compensation were eligible to participate in the Seaboard plan; the letter from the president of the company said that Chessie and Seaboard were going to adopt "the same" employee benefit plan; the letter therefore constitutes a promise that Chessie's contract workers earning nonmonthly compensation would be eligible to participate in the new pension plan, apparently on a retroactive basis and despite the plain language of the plan descriptions. This argument, we think, has no support in the law or the facts. It merits no discussion. The district court was correct to grant summary judgment against Lynn on the question of whether the pre–1972 years should be credited to him for the purpose of calculating his pension.

 Lynn also asserts that the district court improperly quashed his subpoena of Charles Lockwood, a former employee who sued CSX. He seems to believe that Lockwood sued CSX on a theory related to the letter from Collinson, and that CSX chose to settle Lockwood's claim. Lynn argues that his inability to conduct further discovery on this issue compels reversal. Even if Lynn is correct, however, that Lockwood received a settlement payment from CSX on a similar claim, his legal position is unchanged. Whether CSX chose to settle a previous claim by Lockwood has no bearing on the merits of Lynn's legal argument. A settlement agreement is not a concession by a defendant that a claimant's argument, legal or factual, has merit. There are many reasons why a defendant may choose to settle, and avoiding legal expenses is one of them. Even if CSX and Lockwood entered into a settlement agreement, however, and even if that agreement was an admission of the legal merit of a claim based on the Collinson letter, that admission was made by CSX. It was not ordered by a court. We have found that such a claim has no legal merit. The disposition of Lynn's claim is governed by the unambiguous language of the plan documents. A settlement between CSX and Lockwood is irrelevant.

 Lynn presents a much stronger argument in support of his position that the district court erred in refusing to consider the merits of his claim for military service credit. The district court held that the release Lynn signed as part of his voluntary resignation agreement barred consideration of this claim.

The district court based its determination that the claim was barred on two cases, *Fair*

*v. International Flavors & Fragrances, Inc.*, 905 F.2d 1114 (7th Cir.1990), and *Licciardi v. Kropp Forge Emp. Retirement Plan*, 990 F.2d 979 (7th Cir.1993), the facts of which are almost identical. Employees in these cases sued their employers, alleging discrimination on the basis of age, in the case of *Licciardi*, and sex, in the case of *Fair*. Both Licciardi and Fair were executive-level employees, represented by counsel during lengthy negotiations regarding settlement of their discrimination claims. Their settlement agreements provided for, among other things, large lump sum payments. Both settlement agreements also included releases of the companies from any liability related to the employment or discharge of the settling employees. Both Fair and Licciardi later sued their former employers, arguing that their lump sum settlement payments should have been included as earnings for purposes of pension benefit calculations. In *Fair* and *Licciardi*, the plaintiffs were found to have released the companies from all "contestable claims," claims of which they either knew or should have known at the time they signed releases accompanying their settlements. The district court found that Lynn's claim for military service credit was also a "contestable claim," barred by the release under *Fair* and *Licciardi*.

■ Under the district court's interpretation of these cases, the provisions of the release are in direct conflict with the anti-alienation provisions of ERISA. Title 29 U.S.C. § 1056(d)(1) states that "[e]ach pension plan shall provide that benefits provided under the plan may not be alienated or assigned," and the coordinating section of the Internal Revenue Code states that "[a] trust shall not constitute a qualified trust under this section unless the plan of which such trust is a part provides that benefits provided under the plan may not be assigned or alienated." 26 U.S.C. § 401(a)(13). The anti-alienation provision, however, "does not impose a bar on settlement agreements wherein pension claims are knowingly and intentionally resolved by employees. To apply the anti-alienation provision in [that way] would establish the untenable rule that ERISA prevents plaintiffs from ever entering into a settlement in a dispute over lost pension benefits." *Lumpkin v. Envirodyne Industries, Inc.*, 933 F.2d 449, 455 (7th Cir.1991).

■ Pension entitlements are, without exception, subject to the anti-alienation provision of ERISA. *Patterson v. Shumate*, 504 U.S. 753, 760, 112 S.Ct. 2242, 2247, 119 L.Ed.2d 519 (1992). Contested pension claims, on the other hand, are "simply outside the realm of the provision." *Lumpkin*, 933 F.2d at 456. The distinction between these two categories is a critical one, and, if the decision of the district court is any indication, one that has not yet been drawn with sufficient clarity. A pension entitlement arises under the terms of the pension plan itself. A contested pension claim, by contrast, arises under a settlement agreement. A release may prevent a plan participant from asserting claims based on a settlement agreement, but may not bar claims based on pension entitlements.

■ Our earlier cases have referred to claims arising under settlement agreements as "contestable." We think "contested claim" may be a more accurate phrase, as the claims falling in this category are ones that have been contested, either actually or constructively. Where a claim was not previously contested, it has been considered a "contestable claim" if the claimant had actual or constructive knowledge of the claim at the time of signing the release. While this latter type of claim may also be described as "previously contestable," in that it could have been contested and resolved at the time the release was entered into (but was not), such a claim has been constructively contested. A claim may be considered contested where a claimant knew of the claim at the time a dispute was settled. Whether the parties actually wrangled over a particular claim is not determinative. What matters is whether the claimant knew of the claim and knowingly relinquished it (relinquishment of course including failure to act or to raise the issue at all). While this difference in phrasing may seem minor, a review of the record in this case shows that our previous choice of words has led to confusion. "Contested claim" strikes us as the clearer, and therefore preferable, choice.

The *Fair* case presents an excellent example of what we mean by a contested claim. After Fair sued her employer under a theory of sex discrimination, a settlement agreement was negotiated whereby Fair would receive a lump sum payment of $85,000, would stop reporting for work immediately, would be paid an increased salary for about a year and a half, and would then retire. A release was signed in connection with the settlement. Upon her retirement, Fair sued again, this time seeking to have the $85,000 payment included as earnings for the purpose of her pension calculation. We found that Fair had knowledge—actual or constructive—that the settlement payment would not be included in her pension calculation. This question (whether the settlement payment would be included) was a contested claim. Fair knew it was an issue at the time the release and settlement agreement were negotiated. She failed to include it in the release, and her failure to do so constituted a knowing waiver of that claim. Thinking itself bound by our decision in *Fair*, the district court held that Lynn's military service claim was likewise barred by the release he signed.

We relied on a number of factors to find that Fair knew the pension treatment of the lump sum settlement payment was one of the issues on the bargaining table when she signed the release. Looking back on our articulation of those factors, it is easy to see why the district court found that they applied to Lynn as well. Fair, we said, must have known that her pension was at stake when she settled her claim, because the agreement called for her to retire in less than two years and to stop working immediately. Under the circumstances, "the parties certainly should have been aware of any impact the Settlement Agreement might have upon Fair's impending retirement benefits." *Fair*, 905 F.2d at 1116. We also noted that Fair had a copy of the summary plan description, which indicated that "special payments" were not ordinarily included in calculating pension benefits.

▆▆▆ Looking to these criteria in isolation, it would seem that Fair and Lynn are in the same boat. Lynn, even more than Fair, should have known that the agreement he was signing would effect his retirement benefits—it was, after all, entitled "voluntary resignation agreement." Lynn also had a copy of the summary plan description, which addresses the issue of military service credit. Looking beyond these initial similarities, however, we see that the positions of Lynn and Fair are more different than alike. Fair entered into a negotiated agreement in settlement of a potential lawsuit. Throughout the negotiations, she was represented and advised by counsel. In affirming the dismissal of her claims for increased pension benefits, we noted that "the terms of the settlement reflect the value to IFF of Fair's absence and her withdrawal of the suit," and we "refuse[d] to give Fair for free what she evidently declined to purchase at the settlement negotiations for a price." Comparing Fair's situation to Lynn's, we see that Lynn didn't have a lawyer. He never sat down at the bargaining table, much less negotiated the "purchase price" of anything. He signed a standard form. To impute to him the same level of knowledge as we did to Fair would seem inappropriate given the marked disparity in the circumstances under which they signed the releases. The two indicia of knowledge cited in *Fair* are relevant, but not conclusive. In determining whether a retiree knowingly relinquished a claim, the court must look to all of the circumstances to determine what the claimant knew or reasonably should have known. By making this determination on an individual basis, the court will best effectuate the underlying protective aims of ERISA.

We turn now to a central distinction between this case and its predecessors. Lynn is not asking the court here to interpret the language of the resignation agreement; everyone agrees on what it says. Under the terms of the resignation agreement, Lynn is entitled to "retirement payments in accordance with section 4.02(a) of the CSX Transportation, Inc. Pension Plan." Here is where the similarity between this case and *Fair* and *Licciardi* evaporates completely. Fair and Licciardi both argued that they were entitled to additional pension benefits *under the terms of their settlement agreements*. They were asking the court to interpret, not the language of their pension plans, but the lan-

guage of the agreements they had entered into. Lynn, by contrast, is asking the court to interpret the pension plan itself. "The release did not affect [his] incontestable pension rights; it did affect, as in *Fair*, contestable claims *based on ambiguous terms* in the ... agreement." *Licciardi*, 990 F.2d at 982 (emphasis added). Lynn does not claim the agreement is ambiguous. He does not ask the court to interpret its terms. He seeks to protect military service benefits to which he believes he is entitled *under the terms of the plan*. We take no position on whether he is correct in this belief; that determination can only be made after consideration of his claim on the merits, and we leave it to the district court on remand. In short, it may well be that Lynn has no claim for his two years of military service, but it must be the plan which dictates that result, not the release.

Affirmed in part, and reversed and remanded in part. No costs are awarded.