James G. LAURENZANO, M.D., individually, and on behalf of all others similarly situated, Plaintiff,

v.

BLUE CROSS AND BLUE SHIELD OF MASSACHUSETTS, INC. RETIREMENT INCOME TRUST, Defendant.

No. CIV.A. 99–11751–WGY.

United States District Court, D. Massachusetts.

Jan. 30, 2002.

Edward F. Haber, Shapiro, Grace & Haber, Boston, MA, Christine E. Morin, Shapiro, Grace, Haber & Urmy, Boston, MA, for James G. Laurenzano, M.D., Individually, and on behalf of all others similarly situated, Plaintiffs.

F. Dennis Saylor, IV, Goodwin Procter LLP, Boston, MA, Brian W. Robinson, Laura McLane, McDermott, Will & Emery, Boston, MA, Joseph D. Halpern, Blue Cross and Blue Shield of Mass., Law Department, for Blue Cross and Blue Shield of Massachusetts Inc. Retirement Income Trust, Defendants.

### MEMORANDUM OF DECISION

YOUNG, Chief Judge.

## I. INTRODUCTION

This is a case concerning lump sum distributions under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et. seq.* ("ERISA"). The parties were last before the Court at a hearing held on June 27, 2000. As recounted by this Court in its Memorandum and Order of March 27, 2001:

> James G. Laurenzano, M.D. ("Laurenzano") is a former employee of Blue Cross and Blue Shield of Massachusetts, Inc. During his employment, Laurenzano enrolled in a defined benefit pension plan (the "Plan") administered by Blue Cross and Blue Shield of Massachusetts, Inc. Retirement Income Trust [the "Trust"] . . . .
>
> Under the Plan, a participant's normal retirement benefit is a life annuity beginning at age sixty-five. This life annuity is increased every year to include a [cost-of-living adjustment ("COLA")] payment that reflects changes in the Consumer Price Index.
>
> Rather than receive a life annuity, Laurenzano elected to receive the present value of his pension in a single, lump sum distribution. When Laurenzano received his lump sum distribution, however, it did not include the present value of the projected COLA payments.

134 F.Supp.2d 189, 191 (D.Mass.2001).

That raised the following question:

> If a defined benefit pension plan normally provides retirement benefits in the form of a life annuity that includes a [COLA], must a lump sum distribution

in lieu of the annuity include the present value of the projected COLA payments? *Id.* The Court held that "it must, and that each participant in a plan that does not has approximately six years from the date of his distribution to seek redress." *Id.*

With the question of liability answered, the parties now ask the Court to determine damages.

## A. Procedural Posture

As before, the parties have submitted their dispute to the Court as a case stated and thus have consented to judgment on the written record. *See* Pl.'s Mot. at 1; Def.'s Reply at 1 n. 1. "In effect, judgment on the written record is a bench trial without any witnesses. This highly-efficient procedural device allows a court to resolve factual disputes and enter judgment in one fell swoop." 134 F.Supp.2d at 191 (citing, inter alia, *Garcia–Ayala v. Lederle Parenterals, Inc.,* 212 F.3d 638, 643–45 (1st Cir.2000)); *see also Boston Five Cents Sav. Bank v. Sec'y of Dep't of Hous. & Urban Dev.,* 768 F.2d 5, 11–12 (1st Cir.1985) (Breyer, J.).

## B. Federal Jurisdiction

The Court has jurisdiction. 134 F.Supp.2d at 191 (citing 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)).

1. Treasury Regulation § 1.401(a)–13 refines the definition of "assignment or alienation":

(c) Definition of assignment and alienation -
(1) In general. For purposes of this section, the terms "assignment" and "alienation" include—
(i) Any arrangement providing for the payment to the employer of plan benefits which otherwise would be due the participant under the plan, and
(ii) Any direct or indirect arrangement (whether revocable or irrevocable) whereby a party acquires from a participant or beneficiary a right or interest enforceable against the plan in, or to, all

## II. DISCUSSION

Four issues are before the Court, two legal and two economic. The legal issues are whether any of the class members released their claims and, if not, what rate should be used to calculate prejudgment interest. The economic issues—debated in competing expert reports submitted by the parties—are how future COLAs should be estimated and what rate should be used to calculate the present value of future payment streams.

### A. Legal Issues

### 1. Releases

The class consists of about 3,000 people. Of those people, approximately 1,000 signed some form of release. Anderson Aff. ¶ 3. Before turning to the circumstances of the releases, the Court considers two legal principles.

The first is ERISA's anti-alienation and anti-assignment provision:

§ 1056. Form and payment of benefits

. . . . .

(d) Assignment or alienation of plan benefits
(1) Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated.

ERISA § 206(d)(1), 29 U.S.C. § 1056(d)(1); *accord* IRC § 401(a)(13)(A), 26 U.S.C. § 401(a)(13)(A).[1] The Plan itself

or any part of a plan benefit payment which is, or may become, payable to the participant or beneficiary.
(2) Specific arrangements not considered an assignment or alienation. The terms "assignment" and "alienation" do not include, and paragraph (e) of this section does not apply to, the following arrangements:
(i) Any arrangement for the recovery of amounts described in section 4045(b) of the Employee Retirement Income Security Act of 1974, 88 Stat. 1027 (relating to the recapture of certain payments),
(ii) Any arrangement for the withholding of Federal, State or local tax from plan benefit payments,

contains a similar anti-alienation provision. Def.'s Facts Ex. D § 15.1.

"ERISA's pension plan anti-alienation provision is mandatory and contains only two explicit exceptions, see §§ 1056(d)(2), (d)(3)(A), which are not subject to judicial expansion." *Boggs v. Boggs,* 520 U.S. 833, 851, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997) (citing *Guidry v. Sheet Metal Workers National Pension Fund,* 493 U.S. 365, 376, 110 S.Ct. 680, 107 L.Ed.2d 782 (1990)); *accord Patterson v. ·Shumate,* 504 U.S. 753, 760, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992).[2] The Supreme Court's holding in *Guidry* is striking. In that case, the CEO of a union, who also was a trustee of the union's pension fund, pleaded guilty to embezzling more than $377,000. The district court sent the defendant to prison and imposed a constructive trust on his pension so that the benefits would be paid to the union. The Tenth Circuit affirmed the remedy. The Supreme Court reversed, for the simple reason that ERISA states very clearly that pensions are not subject to alienation or assignment. "Understandably, there may be a natural distaste for the result we reach here. The statute, however, is clear." 493 U.S. at 377, 110 S.Ct. 680.

 The second legal principle is the "heightened scrutiny" that federal common law requires for waivers of ERISA pension benefits. *Morais v. Cent. Beverage Corp. Union Employees' Supplemental Ret. Plan,* 167 F.3d 709, 712–13 (1st Cir.1999);

*Smart v. Gillette Co. Long–Term Disability Plan,* 70 F.3d 173, 181–82 (1st Cir.1995), *aff'g* 887 F.Supp. 383, 385–86 (D.Mass. 1995); *see also Rivera–Flores v. Bristol– Myers Squibb Caribbean,* 112 F.3d 9, 11– 12 (1st Cir.1997) (extending heightened scrutiny to ADA cases). "Waiver and release are affirmative defenses on which the employer bears the burden. Fed.R.Civ.P. 8(c)." *Rivera–Flores,* 112 F.3d at 12. In the ERISA context, the totality of the circumstances must show that the waiver or release was "knowing and voluntary." *Smart,* 70 F.3d at 181 (citing *Rodriguez– Abreu v. Chase Manhattan Bank, N.A.,* 986 F.2d 580, 587 (1st Cir.1993)). "We have found helpful in this endeavor a set of six factors identified by the Second Circuit in *Finz v. Schlesinger,* 957 F.2d 78, 82 (2d Cir.1992)." *Morais,* 167 F.3d at 713. Those factors, which are not exclusive, include:

1. the plaintiff's education and business sophistication,

2. the respective roles of employer and employee in determining the provisions of the waiver,

3. the clarity of the agreement,

4. the time plaintiff had to study the agreement,

5. whether the plaintiff had independent advice, such as that of counsel, and

---

(iii) Any arrangement for the recovery by the plan of overpayments of benefits previously made to a participant,

(iv) Any arrangement for the transfer of benefit rights from the plan to another plan, or

(v) Any arrangement for the direct deposit of benefit payments to an account in a bank, savings and loan association or credit union, provided such arrangement is not part of an arrangement constituting an assignment or alienation. Thus, for

example, such an arrangement could provide for the direct deposit of a participant's benefit payments to a bank account held by the participant and the participant's spouse as joint tenants.

26 C.F.R. § 1.401(a)–13.

**2.** The parties have not addressed the two exceptions, which do not appear relevant anyway: the first allows voluntary and revocable gift promises of up to 10% and the second concerns assignments to former spouses.

6. the consideration for the waiver.

*See id.* at 713 n. 6.

If ERISA's antialienation provision is read to apply to waivers and settlements, it creates a tension with the body of federal common law that allows waivers. The First Circuit has not addressed the interaction of the two principles (or considered whether they even interact), but other courts of appeals have, most notably the Seventh Circuit in a case discussed extensively by both parties, *Lynn v. CSX Transportation, Inc.*, 84 F.3d 970 (7th Cir. 1996).

"[T]his case presents the question of whether a release from liability signed by an employee in exchange for participation in an early retirement program is void in light of the anti-alienation provision of ERISA." *Id.* at 972. In exchange for signing a "voluntary resignation agreement"—which included a broadly-worded release—the plaintiff received his full pension, as provided under the plan, but with an additional five years of service credit and an additional five years of age credit for purposes of the pension calculation. Seven years later, the plaintiff contested the calculation of his pension, arguing that he should have received credit for time he spent in the military. The plaintiff's argument concerned solely the calculation of his *original* pension benefits, not the calculation resulting from the additional credits he earned by resigning early. In its defense, the company simply pointed to the release the plaintiff had signed. *Id.* at 972–75. The district court agreed with the company and granted the defendant's motion for summary judgment. The Seventh Circuit reversed on this point.

Pension entitlements are, without exception, subject to the anti-alienation provision of ERISA. *Patterson v. Shumate*, 504 U.S. 753, 760, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992). Contested pension claims, on the other hand, are "sim-ply outside the realm of the provision." *Lumpkin* [v. *Envirodyne Indus., Inc.*, 933 F.2d 449, 456 (7th Cir.1991)]. The distinction between these two categories is a critical one, and, if the decision of the district court is any indication, one that has not yet been drawn with sufficient clarity. A pension entitlement arises under the terms of the pension plan itself. A contested pension claim, by contrast, arises under a settlement agreement. A release may prevent a plan participant from asserting claims based on a settlement agreement, but may not bar claims based on pension entitlements.

. . . . .

We turn now to a central distinction between this case and its predecessors. [The plaintiff] Lynn is not asking the court here to interpret the language of the resignation agreement; everyone agrees on what it says. Under the terms of the resignation agreement, Lynn is entitled to "retirement payments in accordance with section 4.02(a) of the CSX Transportation, Inc. Pension Plan." Here is where the similarity between this case and *Fair* [v. *International Flavors & Fragrances, Inc.*, 905 F.2d 1114 (7th Cir.1990)] and *Licciardi* [v. *Kropp Forge Division Employees' Retirement Plan*, 990 F.2d 979 (7th Cir. 1993)] evaporates completely. Fair and Licciardi both argued that they were entitled to additional pension benefits *under the terms of their settlement agreements.* They were asking the court to interpret, not the language of their pension plans, but the language of the agreements they had entered into. Lynn, by contrast, is asking the court to interpret the pension plan itself. "The release did not affect [his] incontestable pension rights; it did affect, as in *Fair,* contestable claims *based on ambiguous*

*terms* in the ... agreement." *Licciardi,* 990 F.2d at 982 (emphasis added). Lynn does not claim the agreement is ambiguous. He does not ask the court to interpret its terms. He seeks to protect military service benefits to which he believes he is entitled *under the terms of the plan.* We take no position on whether he is correct in this belief; that determination can only be made after consideration of his claim on the merits, and we leave it to the district court on remand. In short, it may well be that Lynn has no claim for his two years of military service, but it must be the plan which dictates that result, not the release.

*Id.* at 975, 976–77.

Turning to the releases in this case, the Trust groups them into four different categories: (i) those made part of a collective bargaining agreement providing for severance, (ii) those made part of separation agreements, (iii) those made part of litigation settlements, and (iv) those in connection with severance pay. Def.'s Mem. at 15. The parties agree on the law as described above, but they disagree on how it affects these four sets of releases. *Compare* Pl.'s Reply at 11–19, *with* Def.'s Mem. at 15–19, *and* Def.'s Reply at 11–12.

### a. Collective Bargaining Agreement + Release

In 1997, Blue Cross sold a group of physicians—the Metro West physicians—to another entity. Anderson Dep. at 13. As part of that sale, the physicians obtained counsel and negotiated severance payments in exchange for executing releases. Anderson Aff. ¶ 4. Over one hundred physicians executed a release, of whom sixty-nine are class members. *Id.* Laurenzano was part of the Metro West group but did not execute a release. Anderson Dep. at 56. The releases state, in relevant part:

In consideration for severance payments ... offered to me by Blue Cross and Blue Shield of Massachusetts, Inc. ("BCBSMA"), ... I knowingly, willingly and voluntarily ... release BCBSMA, including its ... subsidiaries, divisions, business units, committees, plans, parent companies, successors and affiliated companies, from any and all claims or liability for severance pay or any other claims which I may have against BCBSMA under any Physician Contractual Agreement under any Five Year Long Term Agreement or any One Year Agreement, under any Letter of Agreement, and under any other BCBSMA policy or agreement, whether written or oral, that may apply to me.

Anderson Aff. Ex. A; *accord id.* ¶ 4.

As to these releases, the Court observes:

● Blue Cross, rather than the Trust, negotiated and executed these releases, but the agreements purport to release all of Blue Cross's "plans" in addition to Blue Cross and its corporate family

● the participants signing these releases were highly educated, represented by counsel, and apparently initiated the bargaining that led to the releases and severance payments

● the participants signing these releases apparently were well compensated; the one release attached as an example shows that the physician received $103,695.90 in severance pay

In short, these releases are very favorable to the Trust.

### b. Separation Agreement + Release

Approximately thirty-two upper-level employees negotiated a generous separation agreement, which included a release. Anderson Aff. ¶ 5. These agreements were negotiated through counsel. *Id.* Among those executing agreements were the

CFO, the General Counsel, and members of the Benefits Committee. *Id.* The agreements state, in relevant part:

> This Agreement is made by and between Blue Cross and Blue Shield of Massachusetts, Inc. (hereafter, "BCBSMA") and _____. The purpose of this Agreement is to set forth the terms and conditions of separation of _____'s employment from BCBSMA and to resolve any disputes relating either to his employment with BCBSMA or to its termination.

> · · · · ·

> 9. *Settlement of all Claims.* _____ agrees that the payments and benefits set out in paragraphs 2, 4 and 5 above are made in lieu of all other compensation, benefits, payments, entitlements, or claims for damages of any sort he may have or may have had at any time and constitute complete settlement of all claims, actual or contingent, he may have or ever had against BCBSMA and any of its officers, directors, employees, agents, affiliates, successors and assigns. _____ waives and forever discharges BCBSMA, its officers, directors, employees, agents, affiliates, successors or assigns from any and all liability to pay additional salary, compensation, bonuses, incentive payments, severance, other benefits or damages, it being the express intention of the parties to merge all such rights and claims into this Agreement.

> 10. *Release by* . In consideration of the foregoing, _____ agrees to refrain from instituting any legal, equitable, or administrative action based upon or arising out of his service as an officer, his employment with, resignation from, or termination from employment with BCBSMA, except any action which may arise out of a breach of this Agreement. Further, _____ for himself, his agents, heirs, successors, beneficiaries, and assigns does hereby remise, release and forever discharge BCBSMA and any of its officers, directors, employees, agents, affiliates, successors, and assigns from any and all debts, demands, actions, causes of action, suits, accounts, covenants, contracts, agreements, damages, and any and all claims, demands, and liabilities whatsoever of every name and nature, in law or equity, including, but without limiting the generality of the foregoing, attorneys fees and claims brought for intentional interference with a contractual relationship, defamation, or discrimination, which he ever had, now has, or may in the future have against any of them in any way, directly or indirectly arising out of, in connection with, or by reason of any act, injury, breach, omission, matter, cause or thing whatsoever occurring prior to the execution of this Agreement, including but without limiting the generality of the foregoing, any and all claims, demands and causes of action arising out of or relating to _____'s service as an officer or employee of BCBSMA, including without limitation his resignation or separation from employment with BCBSMA, except any action which may arise out of a breach of this Agreement.

Anderson Aff. Ex. B; *accord id.* ¶ 6.

This Court observes:

- Blue Cross, rather than the Trust, negotiated and executed these releases, and the releases only make passing reference to "benefits" and Blue Cross's "affiliates"

- the participants signing these releases apparently were highly educated and represented by counsel

- the participants signing these releases apparently were well compensated; the one release attached as an example shows that the participant re-

ceived two years' salary in severance pay

In short, these releases are very favorable to *Blue Cross,* but likely do not concern the defendant in this case, the Trust.

### c. Litigation Settlement + Release

Approximately ten employees settled lawsuits against Blue Cross. Anderson Aff. ¶ 7. Each settlement agreement included a release. Those agreements were negotiated through counsel and generally were executed well after the former employee had received his lump sum distribution. *Id.* The agreements state, in relevant part:

Agreement made this ___ day of _____, _____ by and between _____ and Blue Cross and Blue Shield of Massachusetts, Inc. ("Blue Cross") and Cindy Walter (collectively "Released Parties").

WHEREAS, _____ has filed a complaint in Suffolk County Superior Court entitled *v. Blue Cross and Blue Shield of Massachusetts, Inc. and Cindy Walter,* Civil Action No. ___, alleging violations of GL. c. 151B; and

WHEREAS, the parties have agreed to settle finally and fully *v. Blue Cross and Blue Shield of Massachusetts, Inc. and Cindy Walter,* Civil Action No. _____, without trial or any adjudication of any issue of fact or law therein . . . .

. . . . .

7. *Release.* In consideration of the payment made to him under paragraph 1 above, _____ on behalf of himself, his heirs, executors and assigns, releases and forever discharges Ms. Walter, Blue Cross, and Blue Cross's past and present owners, directors, officers, employees and successors, from any and all claims, debts, promises, agreements, charges, complaints or causes of action now existing, both known and unknown, which _____ now has or ever has had, from the beginning of time to the date of this Agreement, including but not limited to all claims of alleged violations of Title VII of the Civil Rights Act of 1964, the Employee Retirement Income Security Act of 1974, the Age Discrimination in Employment Act of 1967, the Rehabilitation Act of 1973, the Older Workers Benefit Protection Act, the Americans with Disabilities Act, and M.G.L. c. 151B, or any other claim relating to or arising out of the termination of _____'s employment with Blue Cross in _____, _____, and all claims which were or could have been asserted in *v. Blue/BlueShield of Massachusetts, Inc.* . . . . Notwithstanding anything to the contrary in this paragraph 7, _____'s rights to vested pension benefits that may be due him under the terms of Blue Cross's pension benefit plan remain unaffected by this release.

11. *Acknowledgment.* In signing this Agreement, _____ acknowledges that he understands its provisions, that his agreement is knowing and voluntary, that he has been afforded a full and reasonable opportunity to consider its terms and to consult with or seek advice from an attorney or any other person of his choosing, and that he has been advised by the defendants to consult with an attorney prior to executing this Agreement and he has in fact done so.

Anderson Aff. Ex. C; *accord id.* ¶ 7.

The Court observes:

- Blue Cross, rather than the Trust, negotiated and executed these releases, and the releases specifically state that they do *not* affect "vested pension benefits" as provided under the terms of the Plan
- the participants signing these releases were represented by counsel
- the participants signing these releases apparently were well compensated; the one release attached as an exam-

ple shows that the participant received $186,063.77 as part of his litigation settlement

In short, these releases are very favorable to *Blue Cross*, but likely do not concern the defendant in this case, the Trust.

### d. Severance Pay + Release

Over one thousand class members executed releases in exchange for severance pay after Blue Cross had eliminated the need for their positions. Anderson Aff. ¶ 8; *id.* Ex. E (listing employees). There is no indication that counsel were involved. These releases were not negotiated and were offered on a take-it or leave-it basis. The releases state, in relevant part:

1. In return for receiving the severance benefits described in _____'s letter ..., _____ agrees to refrain from instituting any legal, equitable, or administrative action based upon or arising out of his employment with or termination of employment from Blue Cross and Blue Shield of Massachusetts, Inc. ("BCBS"), except any action which may arise out of a breach of this Release. Further, _____ for himself, his agents, heirs, successors, beneficiaries, and assigns does hereby remise, release and forever discharge BCBS, its affiliates, subsidiaries, successors and assigns, and any present or past employees, from any and all debts, demands, actions, causes of action, suits, accounts, covenants, contracts, agreements, damages, and any and all claims, demands, and liabilities whatsoever of every name and nature, in law or equity, including, but without limiting the generality of the foregoing, attorneys fees and claims brought under the Age Discrimination in Employment Act, which he ever had, now has, or may in the future have against them in any way, directly or indirectly arising out of, in connection with or by reason of any act, injury, breach, omission, matter, cause or thing whatsoever occurring pri-

or to the execution of this Release, including but without limiting the generality of the foregoing, any and all claims, demands and causes of action arising out of or relating to _____'s employment with or separation of employment from BCBS, except any action which may arise out of a breach of this Release.

. . . . .

4. _____ represents and agrees, as evidenced by his signature on this Release, that he fully understands his right to discuss all aspects of this Release with his attorney and that, to the extent he desires, he has availed himself of this right, that he was given 21 days in which to fully consider acceptance of all the provisions of this Release, and that he is voluntarily giving the Release.

Anderson Aff. Ex. D; *accord id.* ¶ 8.

The Court observes:

- Blue Cross, rather than the Trust, executed these releases
- the participants signing these releases were *not* represented by counsel and did not have an opportunity to bargain, although they did have an opportunity to reflect upon the terms

In short, even if these releases are effective as to *Blue Cross*, they likely do not concern the defendant in this case, the Trust.

### e. Discussion

■ In addition to the releases mentioned above, every participant at some point was required to elect his form of pension benefit, and in doing so, "acknowledge[d] that [he had] received and read a copy of *How Your Benefit is Paid, If You Terminate Employment Prior to Retirement,* and the *Special Tax Notice Regarding Plan Payments* which include descriptions of the features, and explanations of the relative values of the benefit payment

options provided to [him] under the Pension Plan." Anderson Aff. Ex. F. Given this acknowledgment, the summary plan descriptions provided to participants, and the Plan itself, the Court safely can conclude that participants *knew* that they were foregoing COLA payments when they elected lump sum distributions. At the same time, this Court held in its previous decision that those COLA payments were *accrued* benefits, so the question becomes if and how participants could have waived their entitlement to those accrued benefits.

The Trust concedes that "a person may not waive or release his or her *vested* pension benefit," but, citing *Lynn*, argues that "an ERISA beneficiary can release claims that are 'contested pension claims' as opposed to a vested pension benefit." Def.'s Mem. at 16. If this is the Trust's best argument, the Trust is in trouble. *Lynn* hurts the Trust's position. *Lynn* clarified that a "contested pension claim," as that phrase has been used in the Seventh Circuit, "arises under a settlement agreement." 84 F.3d at 975. The dispute in this case does not turn on the meaning of any settlement agreement, but rather on the meaning of the Plan and the law—the sort of "pension entitlement" that *Lynn* held could not be waived: "A release may prevent a plan participant from asserting claims based on a settlement agreement, but may not bar claims based on pension entitlements." *Id.*

▮ Putting aside the Seventh Circuit's jurisprudence, the Trust faces another problem: almost all of the releases described above never mentioned the Plan, and the few releases that do mention the Plan are vague on the point. This creates two problems for the Trust. First, it belies the argument that the releases were knowing and voluntary. Second, as Laurenzano points out, the Trust is a legal entity sepa-

rate from Blue Cross, ERISA § 502(d), 29 U.S.C. § 1132(d), so releasing Blue Cross does not automatically release the Trust. *See Barron v. UNUM Life Ins. Co. of Am.*, 260 F.3d 310, 315–16 (4th Cir.2001); *Antoniou v. Thiokol Corp. Group Long Term Disability Plan*, 849 F.Supp. 1531, 1534 (M.D.Fla.1994).

▮ Other than the Metro West physicians who, then being represented by counsel, knowingly, intelligently, and voluntarily released this claim, the combination of ERISA's anti-alienation provision, the "heightened scrutiny" applied to waivers under ERISA, *Lynn*, and the Trust's separateness from Blue Cross all serve to undermine its argument that any other class members released their causes of action in this case. Given that the burden is on the Trust to prove the affirmative defense of waiver, the Court holds that, as to the remainder of the class, the Trust has failed to meet its burden.

### 2. Prejudgment Interest

Laurenzano wants prejudgment interest at the rate of 12%, Mass. Gen. Laws ch. 231, § 6C. The Trust argues the rate should be no more than the federal post-judgment rate, 28 U.S.C. § 1961(a), currently around 2.3%.[3] *Compare* Pl.'s Mem. at 4–6, *and* Pl.'s Reply at 9–11, *with* Def.'s Mem. at 12–14, *and* Def.'s Reply at 9–11. Although both parties point to statutes, they both properly recognize that prejudgment interest is a matter of federal common law within the discretion of this Court. The rate the Court selects, however, will have an enormous impact on the total damage award: if everything were to go Laurenzano's way, except for prejudgment interest, the class will receive about $15,000,000. If everything goes Laurenzano's way, including prejudgment interest

---

**3.** The "weekly average 1–year constant maturity Treasury yield," 28 U.S.C. § 1961, is

available at <http://www.federalreserve.gov/releases/H15/data/wf/tcm1y.txt>.

at 12%, the class will receive about $30,000,000. *Compare* Pl.'s Ex. 3, Cooper Ex. 1 at 10 n. 6, *with* Pl.'s Ex. 1 at 2.

The leading case in the First Circuit concerning prejudgment interest in ERISA disputes is *Cottrill v. Sparrow, Johnson & Ursillo, Inc.,* 100 F.3d 220 (1st Cir.1996). Noting the Congressional silence on prejudgment interest in general, and with respect to ERISA cases in particular, the First Circuit provided the following guidance:

- *Availability:* "In ERISA cases the district court may grant prejudgment interest in its discretion to prevailing fiduciaries, beneficiaries, or plan participants." *Id.* at 223.
- *Accrual:* "Ordinarily, a cause of action under ERISA and prejudgment interest on a plan participant's claim both accrue when a fiduciary denies a participant benefits. Setting the accrual date in this manner not only advances the general purposes of prejudgment interest, but also serves ERISA's remedial objectives by making a participant whole for the period during which the fiduciary withholds money legally due. Figuring the accrual date in this way also prevents unjust enrichment." *Id.* at 223–24. (citations omitted)
- *Rate:* "[A] court that elects to award prejudgment interest in an ERISA case has broad discretion in choosing a rate." *Id.* at 225.

*Cottrill* thus leaves the question of prejudgment interest entirely within the discretion of the Court. Exercising that discretion, the Court considers the First Circuit's guidance.

■ *Availability: Cottrill* is a bit misleading if it is read to imply that a court may, in its discretion, simply deny prejudgment interest. That is because Supreme Court "cases since 1933 have consistently acknowledged that a monetary award does not fully compensate for an injury unless it includes an interest component." *Kansas v. Colorado,* 533 U.S. 1, 121 S.Ct. 2023, 2029, 150 L.Ed.2d 72 (2001) (citing *City of Milwaukee v. Cement Division, National Gypsum Co.,* 515 U.S. 189, 195, 115 S.Ct. 2091, 132 L.Ed.2d 148 [1995]; *West Virginia v. United States,* 479 U.S. 305, 310–11 & n. 2, 107 S.Ct. 702, 93 L.Ed.2d 639 (1987); and *General Motors Corp. v. Devex Corp.,* 461 U.S. 648, 655 & n. 10, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983)). In other words, by the time ERISA was enacted in 1974, the federal common law had recognized for over forty years that prejudgment interest is necessary to make a prevailing plaintiff whole. The only real questions for this Court are, therefore, (i) from what date prejudgment interest should accrue and (ii) at what rate it should be compounded.

■ *Accrual:* When it comes to selecting an accrual date, both for prejudgment interest and for the statute of limitations, this case is tricky. In most ERISA cases, such as *Cottrill,* the accrual date is simple: the date when benefits were *denied.* In this case, however, benefits never were denied, they simply were underpaid—a mistake nobody noticed until Laurenzano filed suit twenty-three years after the illegal plan first was introduced. With respect to when the statute of limitations accrued, this Court held that "each class member's cause of action accrued, at the earliest, when he received his lump sum distribution." 134 F.Supp.2d at 210.

The lump sum distribution represents the actual injury to each class member and marks the time after which delay in seeking redress would be unreasonable. The parties agree that were the claim brought under ERISA § 502(a)(1)(B), [29 U.S.C. § 1132(a)(1)(B) ("to recover benefits due to him under the terms of his plan"),] the cause of action would not

accrue until the plan denied the participant's claim for benefits. This Court holds that a claim for recalculation of benefits is not sufficiently different from a claim for benefits under the terms of the plan as to justify a different accrual rule.

*Id.* The same reasoning could be employed to conclude that prejudgment interest should accrue from the date of distribution—after all, that is when the Trust's unjust enrichment began.

Nevertheless, the Court employs a later date of accrual—specifically, the date of Laurenzano's complaint—for two reasons. First, "it may be appropriate to limit prejudgment interest, or perhaps even deny it altogether, where the [plaintiff] has been responsible for undue delay in prosecuting the lawsuit." *Devex Corp.,* 461 U.S. at 657, 103 S.Ct. 2058 (construing 35 U.S.C. § 284). Here, "the lump sum distribution represents the actual injury to each class member *and marks the time after which delay in seeking redress would be unreasonable.*" 134 F.Supp.2d at 210 (emphasis added). Second, even if there has not been undue delay, the Supreme Court recently awarded prejudgment interest from the date of the complaint, rather than the date the defendant knew or should have known that it had caused injury. *Kansas,* 121 S.Ct. at 2031–32 & n. 5. In *Kansas,* the Justices were split on whether to apply prejudgment interest as a matter of course from the date of the injury, or whether to apply a different accrual rule based on "considerations of fairness." In the end, the Supreme Court relied on "considerations of fairness" to pick the date of the complaint as the accrual date, but the Supreme Court also implied that the law now is clear that prejudgment interest ordinarily should run from the date of injury:

> [D]espite the clear direction indicated by some of our earlier opinions, we cannot say that by 1949 our caselaw had developed sufficiently to put Colorado

on notice that, upon a violation of the Compact, we would automatically award prejudgment interest from the time of injury. Given the state of the law at that time, Colorado may well have believed that we would balance the equities in order to achieve a just and equitable remedy, rather than automatically imposing prejudgment interest in order to achieve full compensation.

*Id.* at 2031.

Here, it is uncertain when the law became clear that prejudgment interest ordinarily should run from the date of injury, but likely the law became clear no earlier than 1987, the year when the Supreme Court stated in a footnote that it had rejected the "balancing of the equities" approach. *West Virginia,* 479 U.S. at 311 n. 3, 107 S.Ct. 702.

In sum, considering that (i) the Trust's unjust enrichment began at the time of each lump sum distribution, but that (ii) delay in bringing suit is a proper basis for reducing prejudgment interest, and that (iii) between 1987 and 2001 the Supreme Court was clarifying that prejudgment interest ordinarily should accrue from the date of injury, the Court concludes that in this case the best accrual date is the date of Laurenzano's complaint.

■ *Rate:* The parties central dispute concerns what rate should be applied. *Cottrill* provides this guidance:

> The appellant insists that the lower court departed from "clear federal appellate court precedent" favoring the use of state prejudgment interest rates in ERISA cases. He is wrong. Although federal courts sometimes have looked to state rates for guidance, they have done so as a matter not of compulsion, but of discretion. Indeed, the appellant's argument conveniently overlooks numerous ERISA cases in which federal appellate

and district courts have approved use of the federal statutory rate for prejudgment interest.

We need not tarry. The law confers discretion on the trial judge, not on the court of appeals. In this instance the judge chose to use the federal statutory rate in computing prejudgment interest. Utilizing this rate promotes uniformity in ERISA cases. Furthermore, the federal rate is an objective measure of the value of money over time, and the record makes manifest that, in selecting it, the district judge considered both the rationale of full compensation and ERISA's underlying goals. We note, too, that the federal rate is especially appropriate in this case because the Plan's funds were initially invested in Treasury bills. *See, e.g., Algie* [v. *RCA Global Communications, Inc.,* 891 F.Supp. 875, 899 (S.D.N.Y.1994) ] (finding the federal rate appropriate when it more closely approximated the likely return on the funds withheld)[, *aff'd,* 60 F.3d 956 (2d Cir.1995) ]. Mindful of these realities, we do not think that equity demands the use of a higher rate.

100 F.3d at 225 (citations omitted). In short, *Cottrill* provides ammunition for both sides: a court cannot go wrong by using the federal rate, but a court has the discretion to use a state rate, especially if that rate approximates the likely return on the funds withheld. Laurenzano's expert argues that the Massachusetts rate of 12% is a perfect fit because the Plan "earned an average yield of 11.4% on its assets" between 1993 and 1999. Pl.'s Ex. 1 at 3.

Although the federal post-judgment (treasury bill) rate is common, precedent supports awarding something more because the treasury bill rate represents a risk-free rate of return—a rate below what any creditor would charge. In the Seventh Circuit, for example, it is an abuse of discretion to award less than the prime rate without providing a good reason for

doing so. *First Nat'l Bank v. Standard Bank & Trust,* 172 F.3d 472, 480 (7th Cir.1999). That being said, Laurenzano's proposed rate of 11.4% likely is too high for two reasons: the Plan's rate of return between 1993 and *2002,* the year when judgment (hopefully) will enter, probably is below 11.4%, and regardless, the focus likely should be on making the class members whole rather than disgorging the Trust's gains. Moreover, several cases support Laurenzano's position. Judge Ponsor recently wrote, "This court will adopt the 12 percent rate of Mass. Gen. L. ch. 231, § 6C. As plaintiffs have argued, it would be inequitable for a breach of an obligation to pay funds owed under a pension contract in Massachusetts to generate less interest than a breach of a simple contract." *Gallagher v. Park W. Bank & Trust Co.,* 951 F.Supp. 10, 14 (D.Mass. 1997). The Sixth Circuit recently affirmed prejudgment interest at the higher of (i) the federal rate and (ii) the rate actually earned by the pension plan. *Rybarczyk v. TRW, Inc.,* 235 F.3d 975, 985–87 (6th Cir. 2000). The Sixth Circuit noted that this award was unusual, but found it acceptable because it was not punitive and, at most, prevented unjust enrichment. *Id.* at 986. Finally, the Fourth Circuit recently affirmed prejudgment interest at the rate of 12% given that the stock market during the relevant time period (1992 through 1997) had risen 19% annually. *Fox v. Fox,* 167 F.3d 880, 884 (4th Cir.1999).

■ Here, in the exercise of its discretion, the Court seeks to have it both ways, awarding a higher rate of interest—the prime rate—but for a shorter period of time—specifically, from the date of Laurenzano's complaint. Before that date—from the date of distribution until the date of Laurenzano's complaint—the Court awards the more conservative federal rate (adjusted each year, rather than on a fixed

basis as specified by 28 U.S.C. § 1961, to reflect more accurately the risk-free rate of return over time).[4]

## B. Economic Issues

The Court held that each participant in the Plan that received a lump sum distribution without the present value of his projected COLA payments had approximately six years from the date of his distribution to seek redress. The complaint was filed in 1999, so the class period extends no further back than about 1993. The question, then, is how to project the COLA payments for each participant, and then how to discount them to present value.[5]

**4.** The annual average (i) prime and (ii) 1–year constant maturity Treasury yields for the past several years have been:

| Year | Prime | T–Bill |
|------|-------|--------|
| 1993 | 6.00 | 3.43 |
| 1994 | 7.15 | 5.32 |
| 1995 | 8.83 | 5.94 |
| 1996 | 8.27 | 5.52 |
| 1997 | 8.44 | 5.63 |
| 1998 | 8.35 | 5.05 |
| 1999 | 8.00 | 5.08 |
| 2000 | 9.23 | 6.11 |

<http://www.federalreserve.gov/releases /H15/data/a/prime.txt>; <http://www. federalreserve.gov/releases/H15/data/a/ tcm1y.txt>. The 2001 yields likely will be similar to the yields in 1993 or 1994.

**5.** The parties apparently agree on the other question that must be answered before calculating a lump sum distribution: the applicable mortality table. *Compare* Pl.'s Ex. 1 at 2, *with* Pl.'s Ex. 3, Cooper Ex. 1 at 4, 6 n. 2. Two mortality tables are common: the UP–1984 mortality table with a 40% male and 60% female mix, and the 1983 Group Annuity Mortality Table ("1983 GAM") with a 50% male and 50% female mix. *See generally* 26 C.F.R. § 1.401(a)(4)–12 (defining UP–1984 and 1983 GAM as "standard mortality tables"); 29 C.F.R. pt. 4044, app. A (supplying 1983 GAM table); *McDaniel v. Chevron Corp.*, 203 F.3d 1099 (9th Cir.2000) (discussing UP–1984 and 1983 GAM tables);

## 1. Projected COLA Payments

■ According to the Court's Memorandum and Order of March 27, 2001, the Plan was required to *project*, at the time of each lump sum distribution, what the participant would have received in COLA payments. For example, if a participant retired in 1995 at age 50, and normally would have received a life annuity beginning in 2010, but instead chose to receive a lump sum distribution immediately, the Plan was required to project what the COLA would be for 2011, 2012, 2013, and so on (until the participant's projected death, according to the applicable mortality table) and include the present value of all projected COLA payments with the lump sum distribution.

<http://www.soa.org/tablemgr/tablemgr.asp> (supplying mortality tables).

To calculate the present value of an accrued benefit, the law currently specifies that the "applicable mortality table" is the 1983 GAM table and the "applicable interest rate" is the yield on 30–year Treasury bonds. *See generally* 26 C.F.R. § 1.417(e)–1(d). Previously the law allowed use of the UP–1984 table and the Pension Benefit Guaranty Corporation ("PBGC") interest rates. The 1983 GAM table is newer than the UP–1984 table and thus assumes people will live longer (and hence be entitled to greater lump sum distributions). Conversely, the yield on 30–year Treasury bonds is higher than the PBGC interest rates and thus produces a lesser present value.

Laurenzano argues that the UP–1984 table should be used for all calculations (along with the PBGC interest rates) because that is what the Plan requires. *See* Def.'s Facts Ex. D § 1.2 (1997 Plan); *id.* Ex. P. § 1.2 (1989 Plan). The Trust agrees that the UP–1984 table should be used whenever the PBGC interest rates are used, but it argues that the Treasury bond rates should be used in certain years, and in those years the 1983 GAM table should be used as required by law. Pl.'s Ex. 3, Cooper Ex. 1 at 4. Laurenzano vigorously disputes the use of the Treasury bond rates but never contests the use of the 1983 GAM table—likely because it is more favorable to him and, regardless, does not make much of a difference either way.

The competing experts present competing methods for projecting COLA payments:

PROJECTED AVERAGE ANNUAL COLA FROM YEAR OF DISTRIBUTION

| Laurenzano's Expert | Trust's Expert |
|---|---|
| 1993: 3.0% (cap) | 1993: 3.0% (cap) |
| 1994: 3.0% (cap) | 1994: 1.9% |
| 1995: 2.6% | 1995: 3.0% (cap) |
| 1996: 2.9% | 1996: 2.4% |
| 1997: 2.9% | 1997: 2.8% |
| 1998: 2.4% | 1998: 2.0% |
| 1999: 1.6% | 1999: 1.0% |

Each calendar year's cost-of-living adjustment was calculated in accordance with the terms of the plan as the increase in the average monthly Consumer Price Index (for Urban Consumers) for the months of March through August, not to exceed 3% per year. I applied the rate in the year of distribution for all subsequent years. The basis and reasons for use of this assumption are the Plan document, my experience and training as an Enrolled Actuary and Section 411(b)(1)(B)(iv) of the Internal Revenue Code that specifies that in accrued benefit calculations, "social security and all other relevant factors used to compute benefits shall be treated as remaining constant as of the current year for all years after the current year."

The assumed rate of *future COLAs* is a factor that neither the law nor the BCBS Plan addressed with respect to lump sum payments at the time that the class members received benefits. (The law still does not address it.) In 1998, before this suit was filed, the BCBS Plan was amended explicitly to reflect the value of the COLA in lump sum calculations. At that time, the Plan was also amended to provide that, in calculating a lump sum, the assumed rate of future COLAs would be determined by using the yield on 30-year Treasury bonds from October of the year prior to payment, less 4%, and subject to a cap of 3%. This is the formula that should be used in estimating future COLAs with respect to benefits payable to class members, as (1) it reflects the Plan sponsor's intent, and (2) is a reasonable and widely accepted measure of expected future inflation.

| Pl.'s Ex. 1 at 2. | Pl.'s Ex. 3, Cooper Ex. 1 at 4. |
|---|---|

---

In short, Laurenzano argues that the method set forth in the 1997 Plan should be used (with the first year's COLA used for all future years) [6] while the Trust ar-

6. *See* Def.'s Facts Ex. D § 5.7 (1997 Plan); *accord id.* Ex. P § 5.7 (1989 Plan). The Court has performed below the calculations described in the 1989 and 1997 Plans (without accounting for the 3% cap). The projected COLA value is in the right-hand column for the year before the year of the lump sum distribution (subject to a 3% cap).

| Year | Mar. | Apr. | May | June | July | Aug. | Avg. | % Chg. |
|---|---|---|---|---|---|---|---|---|
| 1991 | 135.0 | 135.2 | 135.6 | 136.0 | 136.2 | 136.6 | 135.8 | |
| 1992 | 139.3 | 139.5 | 139.7 | 140.2 | 140.5 | 140.9 | 140.0 | 3.1 |
| 1993 | 143.6 | 144.0 | 144.2 | 144.4 | 144.4 | 144.8 | 144.2 | 3.0 |
| 1994 | 147.2 | 147.4 | 147.5 | 148.0 | 148.4 | 149.0 | 147.9 | 2.6 |
| 1995 | 151.4 | 151.9 | 152.2 | 152.5 | 152.5 | 152.9 | 152.2 | 2.9 |
| 1996 | 155.7 | 156.3 | 156.6 | 156.7 | 157.0 | 157.3 | 156.6 | 2.9 |
| 1997 | 160.0 | 160.2 | 160.1 | 160.3 | 160.5 | 160.8 | 160.3 | 2.4 |
| 1998 | 162.2 | 162.5 | 162.8 | 163.0 | 163.2 | 163.4 | 162.9 | 1.6 |

gues that the method set forth in the 1998 Plan (which explicitly addressed this issue) should be used.[7] *Compare* Pl.'s Mem. at 2–4, *and* Pl.'s Reply at 2–4, *with* Def.'s Mem. at 3–5, *and* Def.'s Reply at 7–9.

Neither method proposed by the experts is particularly satisfying, but of the two, the Trust's method is better. The reason for the disappointment is twofold: First, both methods include a cap of 3%. A cap is suspect because it prevents the peaks from evening out the valleys; instead participants are stuck with all of the downside and none of the upside. The Court allows the cap, however, because the Plan has always required the same 3% cap for those participants who do *not* elect to receive a lump sum. Second, both methods tie the

assumed rate of *all* future COLAs to a *single* variable, thus producing wide year-to-year variations. For example, both methods predict that *all* future COLAs will average about 3% after 1997, but that by 1999 *all* future COLAs will average only about 1%. Although history shows that the cost of living has varied considerably from year to year, history also shows that on average the cost of living has increased about 3.5% each year.[8] Indeed, for funding purposes, the Plan assumes that the Consumer Price Index will increase at the rate of 3.5% per year, and thus the Plan also assumes that the COLA payments will increase at the capped rate of 3.0% per year. Pl.'s Ex. 2 at 17. In short, the average of *all* future COLAs

<ftp://ftp.bls.gov/pub/special.requests/cpi/cpiai.txt>.

7. *See* Def.'s Facts Ex. R § 1.2 (1998 amendment). The Court has performed below the calculations described in the 1998 Plan (without accounting for the 3% cap). As required by the 1998 Plan, the interest rate used is the annual interest rate on 30–year Treasury securities in the month of October in the year prior to the year of distribution, except that in 1997 and 1998 the lesser of October and December is used. (In 1997, the December rate was 5.99% while the October rate was 6.33%.) The projected COLA value is in the right-hand column for the year before the year of the lump sum distribution (subject to a 3% cap).

| Year | 30–yr T-bond | Less 4% |
|------|------|------|
| 1992 | 7.53 | 3.5 |
| 1993 | 5.94 | 1.9 |
| 1994 | 7.94 | 3.9 |
| 1995 | 6.37 | 2.4 |
| 1996 | 6.81 | 2.8 |
| 1997 | 5.99 | 2.0 |
| 1998 | 5.01 | 1.0 |

<http://www.federalreserve.gov/releases/ H15 /data/m/tcm30y.txt>; *accord* <http:// www.soa. org/library/stats/ seb_tab1a.xls>.

8. Historically, the Consumer Price Index for all urban consumers, averaged across the twelve months in each year, has increased an average of 3.4% per year, although it increased by more than 10% as recently as 1979, 1980, and 1981:

| Year | % Chg | Year | % Chg | Year | % Chg | Year | % Chg | Year | % Chg | Year | % Chg |
|------|------|------|------|------|------|------|------|------|------|------|------|
| 1914: | 1.0 | 1929: | 0.0 | 1944: | 1.7 | 1959: | 0.7 | 1974: | 11.0 | 1989: | 4.8 |
| 1915: | 1.0 | 1930: | -2.3 | 1945: | 2.3 | 1960: | 1.7 | 1975: | 9.1 | 1990: | 5.4 |
| 1916: | 7.9 | 1931: | -9.0 | 1946: | 8.3 | 1961: | 1.0 | 1976: | 5.8 | 1991: | 4.2 |
| 1917: | 17.4 | 1932: | -9.9 | 1947: | 14.4 | 1962: | 1.0 | 1977: | 6.5 | 1992: | 3.0 |
| 1918: | 18.0 | 1933: | -5.1 | 1948: | 8.1 | 1963: | 1.3 | 1978: | 7.6 | 1993: | 3.0 |
| 1919: | 14.6 | 1934: | 3.1 | 1949: | -1.2 | 1964: | 1.3 | 1979: | 11.3 | 1994: | 2.6 |
| 1920: | 15.6 | 1935: | 2.2 | 1950: | 1.3 | 1965: | 1.6 | 1980: | 13.5 | 1995: | 2.8 |
| 1921: | -10.5 | 1936: | 1.5 | 1951: | 7.9 | 1966: | 2.9 | 1981: | 10.3 | 1996: | 3.0 |
| 1922: | -6.1 | 1937: | 3.6 | 1952: | 1.9 | 1967: | 3.1 | 1982: | 6.2 | 1997: | 2.3 |
| 1923: | 1.8 | 1938: | -2.1 | 1953: | 0.8 | 1968: | 4.2 | 1983: | 3.2 | 1998: | 1.6 |
| 1924: | 0.0 | 1939: | -1.4 | 1954: | 0.7 | 1969: | 5.5 | 1984: | 4.3 | 1999: | 2.2 |
| 1925: | 2.3 | 1940: | 0.7 | 1955: | 0.4 | 1970: | 5.7 | 1985: | 3.6 | 2000: | 3.4 |
| 1926: | 1.1 | 1941: | 5.0 | 1956: | 1.5 | 1971: | 4.4 | 1986: | 1.9 | | |
| 1927: | -1.7 | 1942: | 10.9 | 1957: | 3.3 | 1972: | 3.2 | 1987: | 3.6 | | |
| 1928: | -1.7 | 1943: | 6.1 | 1958: | 2.8 | 1973: | 6.2 | 1988: | 4.1 | | |

<ftp://ftp.bls.gov/pub/special.requests /cpi/cpiai.txt>.

likely should hover around 3.0 to 3.5%, rather than fluctuate wildly from year to year.

With these criticisms in mind, the Trust's method is the lesser of the two evils because it is more theoretically sound and because it currently is used by the Plan. Economic *theory* supports the idea that interest rates consist of (i) a real interest rate, currently around 3% or 4%, Pl.'s Ex. 3, Cooper Ex. 1 at 4, and (ii) inflation. In other words: "inflation rate forecasted by investors = nominal interest rate—real interest rate." Richard A. Brealey & Stewart C. Myers, *Principles of Corporate Finance* 674 (6th ed.2000). Thus, if you know the nominal interest rate, and real interest rates are assumed always to be around 4%, then you always can derive the predicted rate of inflation. This theory has problems—one of them being that the real interest rate historically has not remained constant—but it is "a useful rule of thumb. Thus, if the expected inflation rate changes, your best bet is that there will be a corresponding change in the interest rate." *Id.* at 675. Laurenzano's method, on the other hand, simply takes one year's COLA and assumes *all* future COLAs will be the same. No economic theory supports this method, for the obvious reason that it simply magnifies a given peak or valley rather than predicts what the average of all future peaks and valleys will be. The only support Lauren- zano gives for his method is 26 U.S.C. § 411(b)(1)(B)(iv), which concerns the extent to which a plan may "backload" the accrual of benefits. The statute allows a plan to increase the rate of accrual each year by a maximum of 33.3%. To test whether a plan is complying with this restriction, "social security benefits and all other relevant factors used to compute benefits shall be treated as remaining constant as of the current year for all years after the current year." *Id.* This backloading test is entirely irrelevant to the question of how to project future COLA payments and, regardless, merely requires the Plan to assume that all future COLA payments are fixed at 3.0%, the maximum allowed by the Plan. In short, the statute provides no guidance, legal or economic, on how to project future COLA payments.

In these circumstances, the Court employs the Trust's method of projecting all future COLA payments.

### 3. Present Value

■■■ Laurenzano wants to use the Pension Benefit Guaranty Corporation ("PBGC") rate for lump sum distributions, as specified in the 1989 and 1997 Plans; the Trust wants to use the yield on 30–year Treasury bonds, as now used by the Plan and required under the Internal Revenue Code as a result of the General Agreement on Trade and Tariffs ("GATT").

| INTEREST RATES FOR CALCULATING PRESENT VALUE | |
|---|---|
| Laurenzano's Expert | Trust's Expert |
| 1993: 5.75% (PBGC) [9] | 1993: 6.90% (120% PBGC) |
| 1994: 4.50% (PBGC) | 1994: 5.40% (120% PBGC) |
| 1995: 6.00% (PBGC) | 1995: 7.94% (GATT) |
| 1996: 4.50% (PBGC) | 1996: 6.37% (GATT) |
| 1997: 4.50% (PBGC) | 1997: 6.81% (GATT) |

**9.** All the PBGC rates listed in this table are the "immediate" rates, for those participants entitled to be in pay status on the valuation date. The PBGC also provides "deferral" rates—which are less than the "immediate" rates—if the valuation date comes before the date when the participant is entitled to the annuity.

| 1998: 4.25% (PBGC) | 1998: 5.99% (GATT) |
|---|---|
| In calculating lump sums, I relied upon the Plan's definition of Actuarial Equivalence, using the PBGC interest rates in effect at the beginning of the calendar year of the lump sum payment date. The basis and reasons for use of these assumptions are the Plan document,[10] my experience and training as an Enrolled Actuary, Internal Revenue Code §§ 411(a) and 417(e)(3), and Treasury Regulation 1.417(e)–1(d). | *The Appropriate Rate for Distributions in 1995 through 1998 is 30–Year Treasury Bond Yields.* In 1994, Congress amended the Internal Revenue Code to allow plans to use, beginning in 1995, the 30–year Treasury bond yields to calculate lump sum distributions. The law amending the Code is known as GATT.... The BCBS Plan was amended in January 1998 to use GATT rates [11] .... *The Appropriate Rate for Distributions in 1993 through 1994 Is 120% of the PBGC Interest Rates for Amounts Greater than $25,000, and 100% of the PBGC Interest Rates for Amounts Less Than $25,000.* |
| Pl.'s Ex. 1 at 2. | Pl.'s Ex. 3, Cooper Ex. 1 at 6. |

In sum, Laurenzano wants a lower interest rate while the Trust wants a higher interest rate. *Compare* Pl.'s Mem. at 6–15, *and* Pl.'s Reply at 4–9, *with* Def.'s Mem. at 6–12, *and* Def.'s Reply at 2–7. The reason is simple: the lower the interest rate used, the greater the present value, and vice versa. This principle follows from the formula used to calculate present value: $PV = C/r$, where PV is the present value, C is a constant annual payment in perpetuity, and r is an interest rate. For example, if you agree to pay $1,000 a year forever, and the rate of interest is 8%, that stream of payments has a present value of $12,500. If the rate of interest is 5%, that same stream of payments has a present value of $20,000. Finally, if the rate of interest is 0%—that is, cash does not decay over time—then the stream has infinite value. Moreover, consider two additional points: First, an x-year annuity is simply the difference between a perpetuity beginning today and a perpetuity beginning in × years. If × is a lengthy period—say, 50 years—the perpetuity beginning in × years will be worth very little (given the time value of money), so an x-year annuity will be worth almost as much as a perpetuity. In other words, a perpetuity is a simple approximation for a long annuity. Second, the present value of a constantly-growing perpetuity is $C/(r-g)$, where g is the rate at which the perpetuity

**10.** *See* Def.'s Facts Ex. D § 1.2 (1997 Plan). To calculate present value, the 1997 Plan relies upon the PBGC interest rate on the January 1st preceding the date of distribution. The PBGC interest rates for lump sum distributions are available at 29 C.F.R. pt. 4022, app. B, <http://www.pbgc.gov/services/interest /LUMP_SUM.HTM>, and <http://www.soa.org/library/stats /seb_tabla.xls>.

**11.** *See* Def.'s Facts Ex. R § 1.2 (1998 amendment). To calculate present value, the 1998 Plan relies upon the yield on 30–year Treasury securities in the month of October in the year prior to the year of distribution, except that in 1997 and 1998 the lesser of October and December is used. (In 1997, the December rate was 5.99% while the October rate was 6.33%.) The yields on 30–year Treasury securities are available at <http://www.federalreserve.gov/releases /H15/data/m/tcm30y. txt> and <http://www.soa.org/library/stats /seb_tabla.xls>.

grows each year. For example, if the rate of interest is 5%, a stream of payments beginning at $1,000 and increasing every year by 3% has a present value of $50,000. This final example shows what Laurenzano is after: minimizing the difference between r and g. In the case at bar, r is the rate used to calculate present value and g is the COLA rate. If Laurenzano can get an r around 5% and a COLA rate around 3%, r-g will be only 2%, resulting in a lump sum approaching fifty times the annual payments. The Trust, on the other hand, wants to maximize the difference between r and g by choosing an r around 6% and a COLA rate around 2%, whereby r-g will be 4%. (Indeed, the 1998 Plan tries to guarantee that r-g always will be 4% by defining the COLA to be r—4%; r-g will be more than 4% only when r is more than 7%, given the 3% cap on the COLA rate.) Much is at stake: a 2% denominator turns a $1,000 perpetuity into $50,000 while a 4% denominator turns the same perpetuity into only $25,000.

If you want to know ERISA and nothing else, you must look at it as *math*. *Cf.* Oliver Wendell Holmes, *The Path of the Law*, 10 Harv. L.Rev. 457, 459 (1897), *reprinted in* 110 Harv. L.Rev. 991, 993 (1997). This case is not about the Constitution or civil rights or liberty or justice; this case is about addition, multiplication, statistics, and—most of all—economics. *Cf. id.* at 469, *reprinted in* 110 Harv. L.Rev. at 1001. Accordingly, liability and damages are two sides of the same coin: to say a defendant owes no money is to say he is not liable.

This Court held that the Trust is liable. The Court first held that the COLA payments mentioned in the Plan are an "accrued benefit," as defined by ERISA, because they are part of the "annual benefit commencing at normal retirement age." The Court next considered how to transform those COLA payments into a lump sum distribution:

> This Court agrees with the general proposition that ERISA requires lump sum distributions to equal the present value of the participants' accrued benefits, but this Court need not go into additional legal or mathematical detail. The Plan itself provides a present value function that the parties do not contest and that presumably complies with applicable law. Thus, to calculate properly the lump sum distribution, this Court holds that the Plan must project (based on reasonable actuarial assumptions) the stream of COLA payments that a participant would otherwise receive as part of his annual benefit commencing at normal retirement age, and then the Plan must determine the present value of that stream of COLA payments, along with the present value of the fixed annuity payments, using the present value function provided in the Plan.

134 F.Supp.2d at 204 (citation omitted).

In other words, when the Court wrote its opinion on liability, it was well aware that the Trust would try to gain on damages what was being lost on liability. How? With the math, of course. Depending on the interest rates used to determine present value, the Trust's damages vary widely, from tens of millions of dollars to virtually nothing. Rather than allow the Trust to propose new math for its present value function, the Court simply held that the Trust should continue to use the same old math, but with the addition of the projected COLA payments in the lump sum distributions.

As expected, the Trust now wants to change the math for its present value function. Under the Trust's new math, 85% of the class members receive *no* damages, Pl.'s Ex. 3 at 48, and actually would *owe* money to the Plan if that were allowed, *id.*

at 49–51. The Trust's argument is similar to the argument it made on liability, to wit, that much of the Plan is overly generous—in short, a "subsidy"—so the Plan should be allowed to reduce the subsidy as it sees fit. The Court rejected this argument the first time around, and does so again, "because that would return employment law to the day when pensions were a mere gift promise, revocable at the employer's whim." 134 F.Supp.2d at 201.

In the end, the entire case comes down to this: Laurenzano asks this Court to use the interest rate specified in the Plan itself—the PBGC rate. In response, the Trust argues that the law allowed the Plan to use 120% of the PBGC rate before 1995, and the GATT rate after that, but the Plan, in its generosity, used the PBGC rate until 1998; now that the Court has required the Plan to be even *more* generous with respect to COLA payments, the Court should at the same time allow the Plan to be *less* generous with respect to interest rates (even with respect to that portion of a participant's accrued benefit that is not entitled to COLA payments), thus preserving the status quo level of generosity for 85% of the class members. That was the Trust's goal when it amended the Plan in 1998 from PBGC–without–COLA to GATT–with–COLA, Halpern Aff. Exs. A & B, and that is the Trust's goal today. There is nothing inherently good or bad about that goal; the point is simply that when looking to "basic principles of justice that guide a court in extrapolating from the situations for which the parties provided to the one for which they did not," *Cooke v. Lynn Sand & Stone Co.*, 70 F.3d 201, 205 (1st Cir.1995) (internal quotation marks omitted), the Court must keep its eyes on the math. Here, to be consistent with its earlier opinion, the Court requires the use of the PBGC rate in the calculation of damages.

## II. CONCLUSION

Pursuant to the determinations made herein, the parties shall, within thirty days of the date of this decision, jointly submit a proposed form of judgment which shall provide for relief to each class member, save for the Metro West physicians, as to each of whom the releases are effective.